JONATHAN K. LEVINE (SBN: 220289)
ELIZABETH C. PRITZKER (SBN: 146267)
BETHANY CARACUZZO (SBN: 190687)
HEATHER P. HAGGARTY (SBN: 244186)
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
Email: jkl@pritzkerlevine.com
      ecp@pritzkerlevine.com
      bc@pritzkerlevine.com
      hph@pritzkerlevine.com

Attorneys for Plaintiffs Steve Croft and Judith Servis

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE CROFT AND JUDITH SERVIS, on behalf of itself and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>ZF FRIEDRICHSHAFEN AG, ZF TRW AUTOMOTIVE HOLDINGS CORP., TRW AUTOMOTIVE INC., TRW AUTOMOTIVE U.S. LLC, TRW VEHICLE SAFETY SYSTEMS INC., HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC., HONDA OF AMERICA MFG. INC., HONDA R&D CO., LTD., TOYOTA MOTOR CORP., TOYOTA MOTOR SALES, U.S.A., INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,<br><br>          Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## INTRODUCTION

1.      In an automobile collision, the difference between life and serious injury or death often comes down to the effectiveness of airbags and seat belts. Auto manufacturers know this and relentlessly tout the safety records of their cars to bolster sales. Not surprisingly, reasonable consumers have come to expect that auto manufacturers will ensure that vehicles have functioning restraint systems in the event of a collision, and would not purchase a vehicle that is known to have a faulty restraint system. And yet, Defendants have prioritized profits over safety, leaving consumers with vehicles of diminished value and an increased risk of injury, and even death.

2.      At issue in this case is a uniform design defect in the Airbag Control Unit ("ACU") designed by Defendant ZF Friedrichshafen AG ("ZF-TRW") to detect a collision, deploy airbags if necessary and engage other restraint systems as needed in a matter of milliseconds. This defect causes the application-specific integrated circuit ("ASIC"), a critical component that monitors signals from the crash sensors throughout the vehicle, to be unreasonably susceptible to damage from electrical overstress ("EOS"). If the ASIC becomes damaged, airbags will not inflate and the seatbelt pretensioner, an essential safety feature that locks a seatbelt into place when a crash is sensed, will not engage, endangering the safety of everyone in the vehicle.

3.      This defect, which resulted in the failure of airbags deploying in six frontal crashes and the death of four people and serious injuries in others, has been the subject of an ongoing investigation by the National Highway Traffic Safety Administration ("NHTSA") that is estimated to include 12.5 million vehicles. The defective ACU ("Defective ACU") is installed in several popular vehicles, including vehicles manufactured, sold, and/or leased by Defendants Honda and Toyota

(collectively, the "Vehicle Manufacturer Defendants").

4.    The Vehicle Manufacturer Defendants and ZF-TRW were involved in the design and testing of the defective ZF-TRW ACUs, and knew or should have known that there was a common uniform defect in the ACU.

5.    Since August 2011, ZF-TRW has been repeatedly informed of the injuries and fatalities that have resulted from non-deployment of airbags and seatbelt pretensioners, and at the request of several car manufacturers and the NHTSA, has been investigating the ACU Defect.  Three car companies – Hyundai, Kia and Fiat Chrysler – also have been investigating EOS damage to the ASIC after multiple collisions in which the safety restraint system failed.

6.    A cursory review of the Vehicle Owner Questionnaires ("VOCs") filed on the NHTSA website shows nearly 70 complaints reporting the non-deployment of airbags and/or failure of seatbelt pretensioners between 2014-2019, in cars sold, leased and manufactured by certain auto makers, including the Vehicle Manufacturer Defendants.

7.    Between January 2016 and May 2018, ZF-TRW communicated with its customers on multiple occasions regarding the ACU Defect and the NHTSA investigation.

8.    Between September 2016 and June 2018, Fiat Chrysler, Hyundai and Kia issued public recalls of some of the vehicles containing the defective ZF-TRW ACUs.

9.    On August 15, 2018, ZF-TRW filed a Part 573 Safety Recall Report for the Hyundai and Kia recall which states, in part:

**"The ASIC in the ACUs may experience EOS damage caused by negative transient voltages generated in the vehicle environment that are outside the vehicle manufacturer's specification during particular front impact events….If a negative transient outside the vehicle manufacturer's specification is generated in a front impact**

**event, it can cause EOS damage to the ASIC that may compromise the ACU's ability to command deployment of an airbag or seatbelt pretensioner in certain circumstances, thus increasing the risk of injury."[1]**

10.     Despite the ongoing communication from ZF-TRW, the reporting of fatalities and injuries due to the non-deployment of airbags via the Early Warning Report and VOCs, the public recalls by Fiat Chrysler, Kia and Hyundai and their own internal review and testing, the Vehicle Manufacturer Defendants still knowingly manufactured, sold, and leased vehicles (and continue to do so) containing ZF-TRW's Defective ACUs, have concealed the ACU Defect and misrepresented their vehicles as safe to consumers and the public.

11.     Further, in spite of having knowledge of the defective ZF-TRW ACU, Defendants completely failed to take any reasonable, much less sufficient, measures to investigate the ACU Defect or protect purchasers, lessees, and the general public.

12.     Disregarding the mounting evidence of the defect, Defendants did not so much as warn consumers, issue recalls, or take any other reasonable steps to protect them from the risk through, for example, systematic loaner vehicle programs. Instead, ZF-TRW delayed taking any action, and Honda and Toyota continue to refuse to recall their affected vehicles, despite knowing they contain a potentially ZF-TRW ACU Defect.

13.     The Vehicle Manufacturer Defendants' knowing failure and/or delay in issuing recalls and providing replacement parts is material and leaves purchasers, lessees, drivers, passengers, and, indeed, the general public, in the disturbing position of being exposed to an ongoing, obvious and unnecessary risk of grave harm.

14.     Defendants knew, and certainly should have known, that the ZF-

---

[1] Part 573 Safety Recall Report filed by Defendant ZF-TRW, August 15, 2018. https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18E043-6125.PDF

TRW ACUs installed in millions of vehicles were defective. By concealing their knowledge of the nature and extent of the ACU Defect from the public, and by continuing to advertise their products as safe and reliable, Defendants have demonstrated a blatant disregard for public welfare and safety. Moreover, Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

15.     As a result of Defendants' misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages. Plaintiffs and the Classes did not receive the benefit of their bargain; they were sold or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Further, purchasers and lessees of the vehicles containing the ACU Defect paid more, in a higher purchase price or higher lease payments, than they would have had the ACU Defect been disclosed.

16.     Defendants' false representations and omissions concerning the safety and reliability of those vehicles and their concealment of the known safety defects plaguing their vehicles and brands, caused Plaintiffs and Class members to purchase or retain vehicles of diminished value.

17.     Plaintiffs and the Classes were deprived of a safe and operative ACU installed in their vehicles, while Defendants have unjustly benefited from their unconscionable delay in recalling their defective products, as they simultaneously avoided incurring the costs associated with recalls and installing replacement parts for years.

18.     Also, as a direct result of Defendants' misconduct, Plaintiffs and the Classes will likely suffer damages in the form of out-of-pocket economic damage and loss-of-use expenses and costs, including, but not limited to, expenses and costs

associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care in the event the Vehicle Manufacturer Defendants finally issue recalls.

19.    Plaintiffs and members of the Classes have been harmed as a direct result of Defendants' conduct, and are entitled to actual damages, including damages for diagnosis, repair and/or replacement costs, damages for the diminished value of their vehicles, compensatory, statutory and punitive damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

## JURISDICTION AND VENUE

20.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C.§1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1331, because Plaintiffs' Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, claims arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.  In addition, under 28 U.S.C. §1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs ordinarily would expect to try them in one judicial proceeding.

21.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

22.    This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965 because they conduct substantial business in the State of California and this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and

causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and, at or about the time of such injuries, Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants elsewhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

23.    Venue lies within this judicial district under 28 U.S.C. §1391(b)(1) and (c)(2) because Defendants' contacts are sufficient to subject them to personal jurisdiction in this District, and therefore, Defendants reside in this District for purposes of venue, or under 28 U.S.C. §1391(b)(2) because certain acts giving rise to the claims at issue in this Complaint occurred, among other places, in this District. Also, venue is proper in this District pursuant to 28 U.S.C. §1407.

## THE PARTIES

### I.  ZF-TRW Defendants

24.    Defendant ZF Friedrichshafen AG ("ZF-TRW") is a foreign for-profit corporation with its principal place of business in Friedrichshafen, Baden-Wurttemberg, Germany. ZF-TRW is a worldwide supplier of driveline and chassis technology for cars and commercial vehicles, including active and passive safety technology. ZF-TRW, either directly or through its wholly-owned subsidiaries, manufactures ACUs for distribution in the United States and ultimate use in California, including the defective ACUs at issue in this litigation. ZF-TRW delivers its products, including the defective ACUs at issue in this litigation, into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of California.

25.    ZF-TRW Automotive Holdings Corp. ("TRW Automotive Holdings") is a subsidiary of ZF-TRW with its principal place of business in Livonia, Michigan. ZF-TRW Automotive Holdings is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the

Vehicle Manufacturer Defendants. ZF-TRW Automotive Holdings sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the Defective ACUs in this litigation. ZF-TRW Automotive Holdings delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including in the State of California.

26.     TRW Automotive Inc. ("TRW Automotive") is a subsidiary of ZF-TRW with its principal place of business in Livonia, Michigan. TRW Automotive is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants. TRW Automotive sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the State of California. TRW Automotive manufactures ACUs in the United States, including the Defective ACUs at issue in this litigation. TRW Automotive delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of California.

27.     TRW Automotive U.S. LLC ("TRW Automotive U.S.") is a subsidiary of TRW Automotive with its principal place of business in Livonia, Michigan. TRW Automotive U.S. is an American supplier of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants. TRW Automotive U.S. sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the Defective ACUs at issue in this litigation. TRW Automotive U.S. delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of California.

28.     TRW Vehicle Safety Systems Inc. ("TRW Vehicle Safety Systems") is a subsidiary of TRW Automotive Holdings with its principal place of business in Farmington Hills, Michigan. TRW Vehicle Safety Systems is an American supplier

of automotive systems, modules, and components to automotive manufacturers, including the Vehicle Manufacturer Defendants. TRW Vehicle Safety Systems sells, designs, manufactures, tests, markets, and distributes ACUs in the United States, including the defective ACUs at issue in this litigation. TRW Vehicle Safety Systems delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of California.

29.     Defendants ZF-TRW, ZF-TRW Automotive Holdings, TRW Automotive, TRW Automotive U.S., and TRW Vehicle Safety Systems are collectively referred to as "ZF-TRW" or the "ZF-TRW Defendants." ZF-TRW is the manufacturer of all the Defective ACUs (defined below) that are the subject of this litigation.

## II.    **Vehicle Manufacturer Defendants**

30.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

31.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California. American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

32.     Defendant Honda of America Mfg. Inc. ("Honda Mfg.") is an Ohio corporation with its principal place of business in Marysville, Ohio. Honda Mfg. is

a subsidiary of Honda Motor. Honda Mfg. is involved in the design, manufacture, testing, marketing, distribution and sale of Honda vehicles in the United States, including those utilizing the Defective ACUs.

33.     Defendant Honda R&D Co. Ltd. ("Honda R&D") is a Japanese corporation with its principal place of business in Wako, Japan. Honda R&D is a subsidiary of Honda Motor. Honda R&D is involved in the design, development, manufacture, assembly, testing, distribution and sale of Honda vehicles, including those utilizing the Defective ACUs.

34.     Defendants Honda Motor, Honda Mfg., Honda R&D, and American Honda are collectively referred to as "Honda" or the "Honda Defendants." Honda vehicles sold in the United States contain Defective ACUs manufactured by the ZF-TRW Defendants. The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of California.

35.     Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States. Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

36.     Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota. Toyota U.S.A. is headquartered in Plano, Texas and is a subsidiary of Toyota.

37.     Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Plano, Texas with major operations in Arizona, California, and Michigan. TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada. TEMA is a subsidiary of Toyota Motor Corporation.

38.    Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants." Toyota vehicles sold in the United States contain Defective ACUs manufactured by the ZF-TRW Defendants. The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States, including the State of California.

39.    Collectively, the Honda Defendants and Toyota Defendants are referred to as the "Vehicle Manufacturer Defendants."

### III.    Plaintiffs

40.    Unless otherwise indicated, all Plaintiffs identified below purchased their Class Vehicles primarily for personal, family, and household use. Plaintiffs and the proposed Classes were harmed and suffered actual damages. The Defective ACUs significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and/or equipped with Defective ACUs and the widespread publicity of the ACU Defect.

41.    Further, Plaintiffs and the Classes did not receive the benefit of their bargain; they were sold or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Further, purchasers and lessees of the vehicles containing the ACU Defect paid more, in a higher purchase price or higher lease payments, than they would have had the ACU Defect been disclosed.  Plaintiffs and the Classes were deprived of having safe, defect-free ACUs installed in their vehicles, while Defendants were unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts.

42.    Plaintiffs and the proposed Classes will also suffer additional

monetary damages, when and if a recall or repair is announced, by virtue of their incurring the expense of taking the time to bring their car in for repairs, in the form of out-of- pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

43.      The Defective ACUs create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs and the proposed Classes.

**Plaintiff Steve Croft - California**

44.      Plaintiff Steve Croft resides in Oakland, California. Plaintiff Croft purchased a new 2014 Toyota Tacoma in 2014 from Downtown Toyota in Oakland, California. The value of his 2014 Toyota Tacoma has been diminished as a result of the ACU Defect. Plaintiff Croft would not have purchased the 2014 Toyota Tacoma or would not have paid as much for it had he known of the problems or risks associated with the vehicle's ACU Defect.

**Plaintiff Judith Servis - Florida**

45.      Plaintiff Judith Servis resides part-time in Melbourne, Florida. Plaintiff Servis purchased a new 2016 Honda Fit EX in 2016 from Southeastern Honda in Palm Bay, Florida. The value of her 2016 Honda Fit has been diminished as a result of the ACU Defect. Plaintiff Servis would not have purchased the 2016 Honda Fit or would not have paid as much for it had she known of the problems or risks associated with the vehicle's ACU Defect.

**FACTUAL ALLEGATIONS**

**I.  DEFINITIONS**

46.      Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually, and on behalf of those similarly situated, for economic

losses stemming from Defendants' manufacture, sale or lease, and false representations or omissions concerning the Defective ACUs in the Class Vehicles, including, but not limited to, diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties and injunctive relief/equitable relief.

47.     "Class Vehicles" refers to all vehicles in the United States that were manufactured, sold, or leased by Vehicle Manufacturer Defendants and are equipped with Defective ACUs (defined below).

48.     "Defective ACUs" refers to all ACUs manufactured by ZF-TRW that contain the ACU Defect, including (a) all ACUs subject to recall or currently under investigation by the NHTSA, identified in the table in paragraph 50 below; and (b) all ZF-TRW ACUs in Vehicle Manufacturer Defendants' vehicles subject to any subsequent expansion of pre-existing recalls or new recalls announced prior to the date of an order granting class certification, relating to the tendency of such ACUs to fail and prevent the deployment of airbags and engagement of seatbelt pretensioners.

49.     All Defective ACUs contain the common uniform ACU Defect. As a result of the ACU Defect, Defective ACUs have an unreasonably dangerous tendency to fail to deploy airbags and engage seatbelt pretensioners.

50.     The following table identifies, to the best of Plaintiffs' understanding, and without the benefit of discovery, the vehicles manufactured by Vehicle Manufacturer Defendants that contain the ACU Defect ("Class Vehicles"):

| Automaker | Make | Model | Model Year |
| --- | --- | --- | --- |

| Honda | Acura | RLX | 2014-2019 |
|-------|-------|-----|-----------|
| Honda | Acura | RLX Hybrid | 2014-2019 |
| Honda | Acura | TL | 2012-2014 |
| Honda | Acura | TLX | 2015-2017 |
| Honda | Acura | TSX | 2012-2014 |
| Honda | Acura | TSX Sport Wagon | 2014 |
| Honda | Acura | TSX Sport Wagon | 2012-2014 |
| Honda | Honda | Accord | 2013-2015 |
| Honda | Honda | Accord Hybrid | 2014-2015 |
| Honda | Honda | Civic | 2012-2015 |
| Honda | Honda | Civic GX | 2012-2015 |
| Honda | Honda | Civic Hybrid | 2012-2015 |
| Honda | Honda | Civic SI | 2012-2015 |
| Honda | Honda | CR-V | 2012-2016 |
| Honda | Honda | Fit | 2012-2017 |
| Honda | Honda | Fit EV | 2013-2014 |
| Honda | Honda | Ridgeline | 2012-2014 |
| Toyota | Toyota | Avalon | 2012-2018 |
| Toyota | Toyota | Avalon Hybrid | 2013-2018 |
| Toyota | Toyota | Corolla | 2011-2019 |
| Toyota | Toyota | Corolla IM | 2017-2018 |
| Toyota | Toyota | Corolla Matrix | 2011-2013 |
| Toyota | Toyota | Sequoia | 2012-2017 |
| Toyota | Toyota | Tacoma | 2012-2019 |

| Toyota | Toyota | Tundra | 2012-2017 |

## II.    ZF-TRW ACUs Have a Common Uniform Defect

51.     The ASIC is an electronic component within the ACU that monitors signals from crash sensors. The ACU is located in the vehicle's passenger compartment, and it connects the ASIC, via electrical wiring, to sensors located at the front of the vehicle.

52.     Within milliseconds of a collision and if working properly, the ACU will detect the collision and signal the safety devices to activate if necessary by simultaneously engaging the airbag system and the seatbelt pretensioner which removes slack from the occupant's seatbelt, pulling the occupant's body firmly into his seat, and milliseconds later, releasing the occupant in a timely manner to receive the maximum protective benefit of the deployed airbag.

53.     The ACU incorporates electrical circuitry, such as diodes, to protect the ASIC from harmful electrical signals that could disrupt or damage its performance. However, this electrical circuitry has proven to be insufficient as the Defective ACUs are allowing excess electrical signals to overwhelm the ASIC during a collision. This overstress results in damage to the ASIC and ultimately causes ASIC failure. This failure prevents deployment of the required airbags and safety devices, and/or affect the proper operation of the ACU. As a result, the vehicle occupant is at risk for significant injury, and even death, in the event of a collision.

### A.    Defendants' Knowledge of the Defect

54.     Defendants have long known about the ACU Defect, yet have fraudulently, intentionally, negligently and/or recklessly concealed the defect from Plaintiffs and the public.

55.     Since 2011, there have been countless non-deployment incidents caused by the Defective ACUs. Despite involvement in investigations, public recalls

by other car manufacturers and knowledge of the ACU Defect, the Defendants have refused to recall and/or delayed recalling vehicles containing the ACU Defect in order to save costs and avoid negative publicity.

56.     ZF-TRW, for example, had knowledge of the ACU Defect at least as early as August 2011, when Hyundai requested that ZF-TRW analyze the ACU from a vehicle in China involved in an event in which the airbags did not deploy.[2] ZF-TRW observed damage on the ASIC that was consistent with EOS.[3]

57.     EOS related incidents became recurring events over the next few years. In February 2012, for example, Hyundai was notified of another collision involving a 2011 Hyundai Sonata airbag non-deployment incident.[4] Then in March 2012, ZF-TRW communicated with Hyundai regarding its analysis of an ACU from a Kia Forte in Egypt involved in an event in which the airbags did not deploy, wherein ZF-TRW observed damage on the ASIC that was consistent with EOS.[5]

58.     Again, in May 2012, ZF-TRW communicated with Hyundai about the investigation of ASICs with observed EOS as a result of a collision.[6] In June 2012, Hyundai inspected a vehicle involved in a non-deployment incident and found no crash event recorded on the EDR.[7] Hyundai requested ZF-TRW's assistance into the investigation.[8] Despite these various incidents, ZF-TRW took no action to have the Vehicle Manufacturer Defendants implement any recalls.

59.     In March 2014, Kia was named in a lawsuit involving an airbag non-deployment incident in a 2012 Kia Forte, which was reported to the NHTSA through

---

[2] Part 573 Safety Recall Report filed by ZF-TRW, TRW Automotive Inc Chronology. https://static.nhtsa.gov/odi/rcl/2018/RMISC-18E043-5831.pdf    [hereinafter    ZF-TRW Chronology].
[3] *Id.*
[4] Part 573 Safety Recall Report filed by HMA, Attachment A, Amended Chronology; https://static.nhtsa.gov/odi/rcl/2018/RMISC-18V137-8310.pdf    [hereinafter    Hyundai Chronology].
[5] ZF-TRW Chronology, *supra* note 3.
[6] *Id.*
[7] Hyundai Chronology, *supra* note 5.
[8] *Id.*

an Early Warning Report.[9] The NHTSA subsequently sent Hyundai an inquiry regarding the non-deployment incident, to which Hyundai responded.[10]

60.     Hyundai and ZF-TRW continued to investigate other non-deployment incidents. In February 2015, at Hyundai's request, ZF-TRW downloaded available data from an ACU installed in a Hyundai Sonata involved in an event in which the airbags did not deploy.[11]

61.     From March to June of 2015, Kia attempted to download data from the ACU of the 2012 Kia Forte that was the basis of the March 2014 lawsuit, but was unable to communicate with the ACU.[12] Kia requested assistance from ZF-TRW, who was also unable to obtain any data.[13] During this time, Kia referred the issue to ZF-TRW, which concluded that non-deployment occurred.[14]

62.     In May 2015, at Kia's request, ZF-TRW downloaded data from a Kia Forte ACU involved in a collision in which the airbags did not deploy.[15]  Also in May 2015, Hyundai was notified of another collision involving an airbag non-deployment in a 2011 Hyundai Sonata.[16] Shockingly, ZF-TRW does not even analyze the data for these vehicles (two Hyundai Sonatas and one Kia Forte) *until over two years later* in August 2017.[17]

63.     In the summer of 2015, ZF-TRW advised Kia that the NHTSA was investigating airbag non-deployment incidents affecting a wide range of vehicle models containing ZF-TRW ACUs.[18] Then in October 2015, Hyundai again

---

[9] Part 573 Safety Recall Report filed by Kia Motor America, Inc. Chronology. https://static.nhtsa.gov/odi/rcl/2018/RMISC-18V363-5570.pdf [hereinafter KMA Chronology].
[10] *Id.*
[11] ZF-TRW Chronology, *supra* note 3.
[12] *Id.*
[13] *Id.*
[14] Hyundai Chronology, *supra* note 5.
[15] ZF-TRW Chronology, *supra* note 3.
[16] Hyundai Chronology, *supra* note 5.
[17] ZF-TRW Chronology, *supra* note 3.
[18] KMA Chronology, *supra* note 10.

inspected a vehicle and found that the vehicle's ACU was non-communicative.[19] Despite the above and ZF-TRW's independent knowledge of the ACU Defect, ZF-TRW continued to conceal the defect from the public and failed to issue any recalls.

64.     According to information filed with the NHTSA, in January 2016, ZF-TRW communicated with car makers, including the Vehicle Manufacturer Defendants, regarding the EOS effect on the ACU factory-installed in certain models years of their vehicles.[20] Then in February 2016, ZF-TRW met with the NHTSA, at ZF-TRW's request, to discuss its investigation of EOS observed on its ACUs and incidents involving non-deployment of airbags.[21] ZF-TRW also provided information regarding all manufacturers with the Defective ACUs to the NHTSA.

65.     Between July and November 2016, Hyundai received two additional reports of collisions involving 2011 Hyundai Sonata vehicles in which similar incidents of airbag non-deployment occurred.  Hyundai did not inform consumers or issue a recall.[22]

66.     In August 2016, ZF-TRW disclosed to the Vehicle Manufacturer Defendants that Fiat Chrysler had decided to recall certain models containing ZF-TRW ACUs.[23]  A month later, in September 2016, ZF-TRW communicated again with the Vehicle Manufacturer Defendants about its ongoing investigation of the ACU Defect, its investigation with the NHTSA and provided data pertaining to ACUs and ASICs, at the NHTSA's request.[24]  None of the Vehicle Manufacturer Defendants issued a recall or informed the public and its consumers of the defect.

67.     On September 13, 2016, Chrysler filed its first Part 573 Safety Recall Report for vehicles that could experience a loss of airbag and seatbelt pretensioner deployment capability due to damage to the ASU's ASIC.  This recall affected

---

[19] Hyundai Chronology, *supra* note 5.
[20] ZF-TRW Chronology, *supra* note 3.
[21] *Id.*
[22] Hyundai Chronology, *supra* note 5.
[23] KMA Chronology, *supra* note 10.
[24] ZF-TRW Chronology, *supra* note 3.

approximately 1.9 million Chrysler vehicles. Despite the significant number of recalled vehicles, the Vehicle Manufacturer Defendants continued to resist implementing their own recalls or informing the general public of the ACU Defect.

68.     In 2017, Transport Canada requested information from Hyundai and ZF-TRW regarding a non-deployment event incident in a 2013 Kia Forte in Canada following a crash which resulted in the vehicle's destruction.[25] In August 2017, ZF-TRW, Kia and Hyundai conducted a joint inspection at a ZF-TRW facility of the ACU of the 2013 Forte that had been flagged by Transport Canada.[26] The inspection identified internal damage to the ASIC and that no EDR data was recorded.[27]

69.     During September through October 2017, Kia received and responded to an inquiry from the NHTSA regarding the non-deployment of the 2013 Forte incident in Canada.[28] In November 2017, the NHTSA's Office of Defects Investigation ("ODI") contacted Hyundai to obtain follow-up information in connection with one of the four vehicles under investigation.[29]

70.     In December 2017, faced with the seriousness of the ACU Defect, Hyundai engaged a third-party engineering firm to study and analyze the facts and circumstances surrounding its investigation and reassessment.[30]

71.     In February 2018, Hyundai and ZF-TRW agreed that the circumstances around the Defective ACU in Hyundai's was consistent with those that prompted Chrysler to issue a recall in 2016, and that the EOS appeared to be the root cause of airbag non-deployment.[31]   Less than a week later, Hyundai issued a limited safety recall on model year 2011 Hyundai Sonata vehicles.[32]   Hyundai's recall continued to put ZF-TRW and the Vehicle Manufacturer Defendants on notice

---

[25] KMA Chronology, *supra* note 10.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Hyundai Chronology, *supra* note 5.
[30] *Id.*
[31] *Id.*
[32] *Id.*

of the ACU Defect. Despite the use of the Defective ACUs in other non-recalled Hyundai vehicles, Hyundai limited the recall to only half a million Hyundai Sonata vehicles.

72.    In March 2018, ZF-TRW again communicated with the Vehicle Manufacturer Defendants regarding the ACU Defect and the status of its investigation.[33] The Vehicle Manufacturer Defendants thus far have refused to issue any recalls, despite ZF-TRW's communications, prior car manufacture recalls involving these Defective ACUs, and the Vehicle Manufacturer Defendants' own knowledge of non-deployment incidents reported by their customers.

73.    On March 16, 2018, the NHTSA opened an initial investigation into the ACU Defect, which, at that time, had caused front air bags to fail to deploy in numerous crashes, resulting in serious injuries and four fatalities.[34] Although initially focused on certain Hyundai and Kia vehicles, the NHTSA identified ZF-TRW as the supplier of the Defective ACUs, thereby putting the Vehicle Manufacturer Defendants on notice that their vehicles contained the same Defective ACUs the NHTSA was investigating. At this point, each of the Vehicle Manufacturer Defendants certainly knew or should have known that their vehicles with ZF-TRW ACUs contained a defect.

74.    On August 15, 2018, ZF-TRW filed a Part 573 Safety Recall Report for the Hyundai and Kia recall which states, in part:

> *"The ASIC in the ACUs may experience EOS damage caused by negative transient voltages generated in the vehicle environment that are outside the vehicle manufacturer's specification during particular front impact events....If a negative transient outside the vehicle manufacturer's specification is generated in a front impact event, it can cause EOS damage to the ASIC that may compromise the ACU's ability to command deployment of an airbag or seatbelt pretensioner in certain*

---

[33] ZF-TRW Chronology, *supra* note 3.
[34] NHTSA PE, *supra* note 1.

*circumstances, thus increasing the risk of injury."[35]*

75.     On April 19, 2019, the NHTSA upgraded its investigation of the ACU Defect involving ZF-TRW ACUs from a Preliminary Evaluation to an Engineering Analysis, in order to "expand the *scope* of the investigation to include [ZF-TRW], the Tier-one supplier and any manufacturers who installed this unit in production vehicles."[36] [emphasis added] The NHTSA's upgrade to an Engineering Analysis only further confirmed what the Vehicle Manufacturer Defendants knew or should have known as to the severity of the ACU Defect and widespread scope of their affected vehicles.

76.     Notably, the NHTSA's Engineering Analysis also disclosed that ODI had recently identified two substantial front crash events involving airbag non-deployments in MY 2018 and MY 2019 Toyota Corollas.[37] The NHTSA found that, following the collisions and similar to other incidents involving non-deployment of the airbag, the ACUs could not be read with an EDR due to EOS.[38] The NHTSA further concluded EOS was the likely cause of the non-deployments in the Toyota incidents. One of these crash events resulted in a fatality.

77.     As discussed above, the Vehicle Manufacturer Defendants knew of the ACU Defect not only through their knowledge of each of the recalls issued by Chrysler, Hyundai and Kia and ZF-TRW's communications advising them of the NHTSA's investigation into the ACU Defect, but also because of the nearly 70 complaints reported on the NHTSA website between 2014-2019 for non-deployment of airbags and/or failure of seatbelt pretensioners upon collision in affected vehicles, including Class Vehicles manufactured, sold or leased by the Vehicle Manufacturer

---

[35] Part 573 Safety Recall Report filed by Defendant ZF-TRW, August 15, 2018. https://static.nhtsa.gov/odi/rcl/2018/RCLRPT-18E043-6125.PDF [hereinafter ZF-TRW Recall Report].
[36] NHTSA EA, *supra* note 1.
[37] *Id.*
[38] *Id.*

Defendants.

78.     Honda was or should have been aware of the 28 customer complaints submitted to the NHTSA between 2014-2019, alerting Honda to the ACU Defect in Class Vehicles and the grave injuries incurred by many customers.  Customers also reported contacting the manufacturer regarding the failure of the safety system, the injuries suffered, and the economic damage incurred and yet received no solutions or compensation.

79.     Despite its communications with ZF-TRW, its knowledge of the Chrysler, Hyundai and Kia recalls related to the same Defective ACU in its own vehicles, and numerous customer complaints about the ACU Defect, Honda fraudulently, intentionally, and/or recklessly concealed the ACU Defect from its customers, the NHTSA, and the public. To date, Honda has refused to issue a recall or admit its vehicles contain the same, uniform ACU Defect.

80.     Likewise, Toyota was or should have been aware of the 24 customer complaints submitted to the NHTSA between 2014-2019, alerting Toyota to the ACU Defect Class Vehicles and the grave injuries incurred by many customers. Customers also reported contacting the manufacturer regarding the failure of the safety system, the injuries suffered, and the economic damage incurred and yet received no solutions or compensation.

81.     Despite its communications with ZF-TRW, its knowledge of the Chrysler, Hyundai and Kia recalls related to the same Defective ACU contained in its own vehicles, and numerous customer complaints about the ACU Defect, Toyota concealed the ACU Defect from its customers, the NHTSA, and the public. To date, Toyota has refused to issue a recall or admit its vehicles contain the same, uniform ACU Defect.

**III.    The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe"**

82.     During all relevant times, through advertisements and promotional

materials, the Vehicle Manufacturer Defendants continuously held out their vehicles as safe and reliable, while uniformly omitting any reference to the ACU Defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements and omissions about Class Vehicles' safety in the Vehicle Manufacturer Defendants' advertisements, press releases, website and promotional materials were material to decisions to purchase or lease Class Vehicles.

83.    Examples of Honda's safety and reliability representations include the following:

- In a press release dated March 7, 2013 and available on its website, Honda asserted that it "leads all other brands in achieving TOP SAFETY PICK+ ratings with four models – Civic, Sedan and Coupe and Accord Sedan and Coupe. Further for the 2013 model year, all Honda and Acura models tested by the IIHS have received a TOP SAFETY PICK or TOP SAFETY PICK+ rating." It goes on to say that the new Civic Sedan was subjected to IIHS' aggressive test which is "designed to simulate when the front corner of a vehicle collides with another vehicle or an object such as a tree or utility pole at a high speed."[39]

- Again, in December 2015, Honda reiterated its industry leader status with eight Honda and Acura vehicles earning a 2016 TOP SAFETY PICK+ rating from the IIHS.[40]

[39] Honda Website – Press Release March 7, 2013: "2013 Honda Civic Sedan and Coupe First Small Cars to Achieve TOP SAFETY PICK+ Rating in IIHS Safety Testing"; https://hondanews.com/honda-automobiles/channels/civic-press-releases/releases/2013-honda-civic-sedan-and-coupe-first-small-cars-to-achieve-top-safety-pick-rating-in-iihs-safety-testing?query=safety.

[40] Honda Website – Press Release December 9, 2015: American Honda is Among Industry Leaders with Eight Honda and Acura Vehicles Earning a 2016 TOP SAFETY PICK+ Rating from the IIHS; https://hondanews.com/honda-automobiles/channels/civic-press-releases/releases/american-honda-is-among-industry-leaders-with-eight-honda-and-acura-

- In a 2015 Acura Safety Leadership Fact Sheet on Honda's website, Honda represented: "[W]e consider your safety a top priority . . . . Safety has been top of mind with Acura engineers since day one . . . . Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."[41]

- In 2017, Honda represented on its website that "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." Indeed, describing the 2017 CR-V Dual-Stage, Multiple-Threshold Front Airbags (SRS), Honda explicitly states: "One or both of these airbags will be deployed only in the event of a sufficient frontal impact. If deployed, these airbags are capable of being inflated at different rates depending on crash severity, seat-belt usage and/or other factors. Frontal airbags are designed to supplement the seat belts to help reduce the likelihood of head and upper body injuries in frontal crashes."[42]

- In 2018, Honda continued to tout its status as an industry leader in safety, "[k]ey to Honda's safety ratings achievements is the Honda Sensing® suite of advanced safety and driver-assistive technologies…"[43]

---

vehicles-earning-a-2016-top-safety-pick-rating-from-the-iihs?query=safety

[41] Acura Safety Leadership Fact Sheet, referenced on Honda website: https://acuranews.com/acura-automobiles/releases/acura-underscores-industry-leading-safety-performance-with-emotional-new-marketing-campaign?page=13
[42] Honda Website – 2017 -http://direct.automobiles.honda.com/2015/cr-v/safety.aspx.
[43] Honda Website – Press Release December 17, 2018: Honda Continues Advancing Toward a Safer Future with 2018-2019 Model Lineup; https://hondanews.com/honda-automobiles/channels/civic-press-releases/releases/honda-continues-advancing-toward-a-safer-future-with-2018-2019-model-lineup?query=safety

84.     Toyota's representations as to safety and reliability of its vehicles are similar:

- In a press release dated September 1, 2016 and available on its website, Toyota stated: "Toyota already has more vehicles rated as *Top Safety Pick* and *Top Safety Pick* + by the Insurance Institute for Highway Safety (IIHS) than any other automaker."[44]

- In a press release dated November 26, 2018 and available on its website, Toyota represented that its Toyota Safety Sense preventative safety package, available in approximately 90% of Toyota and Lexus vehicles since its introduction in March 2015, "helps avoid or mitigate damage and/or injury from serious traffic accidents, based on accident data from Japan, the United States and Europe….With focus on providing everyone with safe, reliable mobility, Toyota considers Safety Sense a cornerstone of safe car-making."[45]

- For years, Toyota has represented on its website that it "promises" that "[f]or us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."[46]

- In 2019, Toyota also represented in its brochure that "[a] driver and front passenger Advance Airbag System, driver and front passenger seat-mounted

---

[44] Toyota Website – Press Release September 1, 2016: Toyota Engineers Easier Access for Child Safety Seat Mounts; https://toyotanews.pressroom.toyota.com/releases/toyota-access-child-safety-seat-mounts.htm
[45] Toyota Website – Press Release November 26, 2018: "Toyota Safety Sense" Preventive Safety Package-equipped Vehicles Top 10 Million Units Globally; https://toyotanews.pressroom.toyota.com/releases/toyota+safety+sense+preventive+safety+package+equipped+vehicles+top+10+million+units+globally.html.
[46] Toyota Website – Toyota's Promise: https://toyota.com.jo/toyota-promise.

side airbags, front and rear side curtain airbags, and driver knee and front passenger seat-cushion airbags come standard on Corolla. It's all part of a system designed to help keep you safe."[47]

85.     Despite such representations, the Vehicle Manufacturer Defendants failed to equip the Class Vehicles with ACUs that would meet these standards and failed to disclose to consumers that their vehicles actually contained dangerous and Defective ACUs.

## IV.   The Vehicle Manufacturer Defendants' Failure to Issue Recalls

86.     The Vehicle Manufacturer Defendants refuse to issue any recalls for vehicles containing the ACU Defect, despite the rising number of ACU failures in their own vehicles, the Fiat Chrysler, Hyundai and Kia recalls, the NHTSA investigation, and its own communications with ZF-TRW about the ACU Defect.

87.     There are currently 12.3 million vehicles that have not been recalled and are the subject of an ongoing the NHTSA investigation into the ACU Defect.

88.     Given the large number of affected vehicles, even if all the vehicles containing the ACU Defect are ultimately recalled, it will be unlikely that they will be repaired in the near term.

89.     Put simply, in spite of the ongoing Takata airbag recall, the largest recall in U.S. history, and 24 deaths due to faulty airbags, Defendants seem to have learned little.  "A single supplier of an important safety component provided what appears to be a defective part across multiple manufacturers and 12 million cars." "While the first fatality reports emerged three years ago, it has taken a higher body count for more significant action to be taken by the NHTSA and most impacted manufacturers remain silent. The industry needs to do better."[48]

### A.   Failure to Provide Replacement Vehicles

---

[47] Toyota Corolla Brochure 2019; https://www.toyota.com/content/ebrochure/2019/corolla_ebrochure.pdf
[48] "U.S. Expands Probe into Air Bag Failures to 12.3 Million Vehicles, PBS.org, April 23, 2019; https://www.pbs.org/newshour/nation/u-s-expands-probe-into-air-bag-failures-to-12-3-million-vehicles

90.     Not only have Vehicle Manufacturer Defendants failed to recall Class Vehicles, they have failed to provide any other form of assistance, despite Class Vehicles not being safe to drive.

91.     Due to Defendants' failures, Plaintiffs and Class members are left with poor options—they must either forgo use of their vehicle; purchase, lease, or rent a new vehicle until Defendants complete and/or issue and complete a recall; or, use a vehicle with a dangerously Defective ACU over an extended period of time.

92.     As Senators Blumenthal and Markey explained about the Takata recalls related to defective airbags: "All drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.     Fraudulent Concealment

93.     Upon information and belief, Defendants have known or should have known about the ACU Defect in their Defective ACUs since at least January 2016, when ZF-TRW informed the Vehicle Manufacturer Defendants of the ACU Defect. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the ACU Defect or Defendants' deception with respect to the ACU Defect.

94.     Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained an ACU Defect and corresponding safety risk. As alleged herein, the existence of the ACU Defect was material to Plaintiffs and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the ACU Defect, the associated safety risk, or that

Defendants were concealing the defect.

95.     Defendants did not fully investigate or disclose the seriousness of the ACU Defect, but instead ignored and concealed the defect from consumers and the public and refused to initiate recalls to remedy the defect.

96.     At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the ACU Defect and corresponding safety risks.

97.     Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment.

98.     For these reasons, any and all applicable statute of limitations have therefore been tolled as a consequence Defendants' ongoing knowledge, active concealment, and denial of the facts alleged herein.

**II.     Estoppel**

99.     Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles, and their safety components. They actively concealed the true character, quality, and nature of the vehicles; and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles, and their safety components. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

**III.     Discovery Rule**

100.     The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective ACUs.

101.     Plaintiffs and Class members, however, had no realistic ability to

discern that the vehicles were defective, until—at the earliest—their airbag(s) failed to deploy or they learned of the NHTSA's investigation into the ACU Defect. Even then, Plaintiffs and Class members would have had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect, and prior knowledge of it.

## CLASS ACTION ALLEGATIONS

102.    The Classes' claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, conduct, and products. Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many—and for some claims, all—states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rule of Civil Procedure 23(a); and (b)(3), and/or (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**I.      The Consumer Classes**

103.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rule of Civil Procedure 23(a); and (b)(2), and/or (b)(3), and/or (c)(4); on behalf of themselves and a Nationwide Consumer Class defined as follows:

All persons in the United States who entered into a lease or bought a Class Vehicle, and who (i) still own or lease the Class Vehicle, as of April 24, 2019 or (ii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

104.    The Plaintiffs allege statewide class action claims on behalf of classes in the following states: California and Florida. Each of these State Consumer Classes is initially defined as follows:

All persons who entered into a lease or bought a Class Vehicle in the States of California and Florida and who (i) still own or lease the Class Vehicle, as of April 24, 2019 or (ii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

## II.    Numerosity and Ascertainability

105.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide and thousands, if not more, Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

106.    Each of the Classes are ascertainable because their members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A), and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## III.    Predominance of Common Issues

107.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and

23(b)(3), because questions of law and fact have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These common and predominating questions of law and fact include, without limitation, the following:

a.   Whether the Class Vehicles suffer from the ACU Defect;

b.   Whether Defendants knew or should have known about the ACU Defect; and, if so, how long Defendants have known of the defect;

c.   Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.   Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

e.   Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing or leasing the Class Vehicles;

f.   Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

g.   Whether Defendants misrepresented that the Class Vehicles were safe;

h.   Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with the ACU Defect;

i.   Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.   Whether Defendants' statements, concealments and omissions

regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.    Whether Defendants violated each of the States' consumer protection statutes and, if so, what remedies are available under those statutes;

l.    Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C.§ 2301, et seq.;

m.    Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

n.    Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

o.    Whether the Class Vehicles suffered a diminution of value because of the Defective ACUs;

p.    Whether Defendants have been unjustly enriched by their conduct;

q.    Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

r.    Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the ACUs in the Class Vehicles are defective and/or not merchantable;

s.    Whether Defendants should be declared responsible for notifying all Class members of the ACU Defect, and ensuring that all vehicles with the ACU Defect are promptly recalled and repaired;

t.    What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants, and to vindicate statutory and public policy; and

u.    How such penalties should be most equitably distributed among Class members.

## IV.    Typicality

108.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because Plaintiffs' claims are typical of the claims of the Class members and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## V.    Adequate Representation

109.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

110.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## VI.    Superiority

111.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2), because Defendants have acted, and refused to act, on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

112.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

113.     Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Class—would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

114.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

115.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

116.     The Classes expressly disclaim any recovery in this action for

physical injury resulting from the ACU Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective ACUs implicate the Class Vehicles; constitute evidence supporting various claims, including diminution of value; and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls; and because of the installation of Defective ACUs as replacement airbags. The increased risk of injury from the ACU Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

### CLAIMS FOR RELIEF

I.    **Nationwide Claims**

    A.    **Federal Claims Against the Vehicle Manufacturer Defendants**

### COUNT 1

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.***

117.    Plaintiffs bring this Count against the Vehicle Manufacturer Defendants on behalf of members of the Nationwide Consumer Class.

118.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a)-(d).

119.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

120.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

121.    The Vehicle Manufacturer Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

122.    The Magnuson-Moss Warranty Act provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or

implied warranty under 15 U.S.C. § 2310(d)(1).

123.    The Vehicle Manufacturer Defendants provided Plaintiffs with express warranties, which are covered under 15 U.S.C. § 2301(6). These express warranties included the repair or replacement of covered defective components arising out of defects in materials and/or workmanship, which would include the ACU Defect, at no cost to owners and lessees of the Class Vehicles.

124.    The Vehicle Manufacturer Defendants further provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, the Vehicle Manufacturer Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

125.    The Vehicle Manufacturer Defendants breached these warranties by failing to disclose and fraudulently concealing information regarding the ACU Defect and failing to timely and sufficiently recall Class Vehicles to repair or replace Defective ACUs, as described above. Defendants are therefore liable to Plaintiffs and the Class, pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective ACUs.

126.    Plaintiffs and members of the Class experienced the ACU Defect within the warranty periods but Defendants failed to inform Plaintiffs and members of the Class of the existence of the ACU Defect and associated safety risk, and failed to provide a suitable remedy or repair of the ACU Defect free of charge within a reasonable time.

127.    Any efforts to limit the implied warranties in a manner that would

exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit liability for the Class Vehicles is null and void.

128.    Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between the Vehicle Manufacturer Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

129.    Any limitations on the warranties are substantively unconscionable. The Vehicle Manufacturer Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. The Vehicle Manufacturer Defendants failed to disclose the ACU Defect to Plaintiffs and the other Class members. Thus, the Vehicle Manufacturer Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

130.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either the Vehicle Manufacturer Defendants or their agents (dealerships) to establish privity of contract.

131.    Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the Vehicle Manufacturer Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

132.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give the Vehicle Manufacturer Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

133.    Furthermore, affording the Vehicle Manufacturer Defendants an

opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of the sale or lease of each Class Vehicle, the Vehicle Manufacturer Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the Vehicle Manufacturer Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

134.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because the Vehicle Manufacturer Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re- accepted their Defective Vehicles by retaining them.

135.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

136.    Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorney's fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and

prosecution of this action.

137.    Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have or will incur in attempting to rectify the ACU Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in getting their Class Vehicles repaired and/or going through the recall process.

138.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Vehicle Manufacturer Defendants' conduct presents common questions of law. Equity and fairness require the establishment by Court decree and administration under Court supervision of a program funded by the Vehicle Manufacturer Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

### B.    Common Law and State Law Claims Against ZF-TRW
### COUNT 2
### Fraudulent Concealment

139.    Plaintiffs bring this claim against ZF-TRW on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

140.    As described above, ZF-TRW made material omissions and/or affirmative misrepresentations regarding the Defective ACUs contained in the Class Vehicles.

141.    ZF-TRW intentionally concealed and suppressed material facts regarding the Defective ACUs—most importantly, the ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belts, thereby failing to protect drivers and passengers in a collision.

142.    ZF-TRW still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the ACU Defect from Plaintiffs and the Class.

143.    ZF-TRW had a duty to disclose the ACU Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing facts from Plaintiffs and Class Members; and

c.    Made false and/or incomplete representations about the safety and reliability of the Defective ACUs and/or Class Vehicles while purposefully withholding material facts from Plaintiff that contradicted these representations.

144.    These omitted and concealed facts were material because they would be relied upon by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products are material concerns to a consumer.

145.    ZF-TRW concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely.

146.    ZF-TRW also misrepresented the safety and reliability of the Defective ACUs and/or Class Vehicles, because it either (a) knew but did not disclose the ACU Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

147.    ZF-TRW actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its ACU units, to protect its profits, and to avoid recalls that would hurt the brand's image and cost ZF-TRW money. It did so at the expense of Plaintiffs and the Class.

148.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

149.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and ZF-TRW's disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of ZF-TRW's fraudulent concealment.

150.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of ZF-TRW's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and the serious safety and quality issues caused by ZF-TRW's conduct.

151.    The value of all Class members' vehicles has diminished as a result of ZF-TRW's fraudulent concealment of the ACU Defect and has made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

152.    Accordingly, ZF-TRW is liable to Plaintiffs and the Classes for their

damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the Defective ACUs.

153.    ZF-TRW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching ZF-TRW. ZF-TRW's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**C.    Common Law and State Law Claims Against the Vehicle Manufacturer Defendants**

**COUNT 3**

**Fraudulent Concealment**

154.    Plaintiffs bring this claim against the Vehicle Manufacturer Defendants on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against the Vehicle Manufacturer Defendants under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

155.    As described above, the Vehicle Manufacturer Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective ACUs contained therein.

156.    The Vehicle Manufacturer Defendants intentionally concealed and suppressed material facts regarding the Defective ACUs—most importantly, the

ACU Defect, which causes, among other things, the Defective ACUs to fail during a crash event resulting in the non-deployment of airbags and seat belt pretensioners, thereby failing to protect drivers and passengers in collisions.

157.    The Vehicle Manufacturer Defendants still have not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continue to conceal material information regarding the ACU Defect, in efforts to avoid a costly recall.

158.    The Vehicle Manufacturer Defendants had a duty to disclose the ACU Defect because they:

a.    Had exclusive and/or far superior knowledge and access to the facts, and the Vehicle Manufacturer Defendants knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing facts from Plaintiffs and Class Members; and

c.    Made false and/or incomplete representations about the safety and reliability of the Defective ACUs and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

159.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted the Vehicle Manufacturer Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall

obligations under the Sale Agreement and governing laws.

160.    The Vehicle Manufacturer Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective ACUs and Class Vehicles were capable of performing safely, as represented by the Manufacturing Defendants and reasonably expected by consumers.

161.    The Vehicle Manufacturer Defendants also misrepresented the safety and reliability of the Defective ACUs and Class Vehicles, because they either (a) knew but did not disclose the ACU Defect; (b) knew that they did not know whether its safety and reliability representations were true or false; or (c) should have known that their misrepresentations were false.

162.    The Vehicle Manufacturer Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect their profits, and to avoid recalls that would hurt the brand's image and cost the Vehicle Manufacturer Defendants money. They did so at the expense of Plaintiffs and the Class.

163.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

164.    Had they been aware of the Defective ACUs installed in the Class Vehicles, and Honda's and Toyota's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Honda's and Toyota's fraudulent concealment.

165.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Honda's and Toyota's concealment of, and failure to timely disclose, the serious ACU Defect in millions of Class Vehicles and

the serious safety and quality issues caused by Honda's and Toyota's conduct.

166.    The value of all Class members' vehicles has diminished as a result of Honda's and Toyota's fraudulent concealment of the ACU Defect and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

167.    Accordingly, the Vehicle Manufacturer Defendants are liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective ACUs and the Class Vehicles, and/or the costs incurred in storing, maintaining, or otherwise disposing of the Defective ACUs.

168.    Honda's and Toyota's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching the Vehicle Manufacturer Defendants. Honda's and Toyota's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 4

### Unjust Enrichment

169.    Plaintiffs (excluding those who did not purchase a Class Vehicle from a Honda or Toyota dealership) bring this claim against the Vehicle Manufacturer Defendants on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Plaintiffs bring this claim under the laws of the

states where Plaintiffs and Class Members purchased their Class Vehicles.

170.    The Vehicle Manufacturer Defendants have received and retained a benefit from the Plaintiffs and inequity has resulted.

171.    The Vehicle Manufacturer Defendants benefitted through their unjust conduct, by selling Class Vehicles to Plaintiffs with a concealed safety-and-reliability related defect, at a profit, for more than these Class Vehicles were worth. Plaintiffs overpaid for these Class Vehicles, and/or would not have purchased these Class Vehicles at all. Furthermore, as a result, Plaintiffs have been forced to pay other costs.

172.    It is inequitable for the Vehicle Manufacturer Defendants to retain these benefits.

173.    Plaintiffs do not have an adequate remedy at law.

174.    As a result of Honda's and Toyota's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

II.    **State Consumer Sub-Class Claims**

    A.    **<u>Claims Brought on Behalf of the Florida Consumer Sub-Class</u>**

**<u>COUNT 7</u>**

**Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 et seq.**

175.    This claim is brought only on behalf of the Florida Consumer Sub-Class against all Defendants.

176.    Plaintiffs and the Florida Consumer Sub-Class are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Section 501.203(7), Florida Statutes.

177.    Defendants are engaged in "trade or commerce" within the meaning of Section 501.203(8), Florida Statutes.

178.    FDUTPA    prohibits    "[u]nfair    methods    of    competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."§ 501.204(1), Fla. Stat. Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

179.    In the course of Defendants' business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

180.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective ACUs installed in them.

181.    As alleged above, ZF-TRW knew or should have known of the ACU Defect no later than August 2011, through its design and development of the ACU, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself and the automakers, internal investigations into airbag non-deployment incidents, government investigations into airbag non-deployment incidents, and public recalls.

182.    As alleged above, Vehicle Manufacturer Defendants knew or should have known of the ACU Defect no later than January 2016, though their approval of the ACU design, countless airbag non-deployment incidents, customer complaints against its products and automakers' vehicles, lawsuits against itself, ZF-TRW, and the automakers, internal investigations, government investigations, and public recalls.

183.    By failing to disclose and by actively concealing the ACU Defect in

the Class Vehicles and/or the Defective ACUs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective ACUs to fail to deploy vehicle safety systems, including airbags and seatbelt pretensioners, in a collision event.

184. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious ACU Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective ACUs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

185. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Florida Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective ACUs installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

186. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead Plaintiffs and the Florida Consumer Sub-Class. Defendants knew or should have known that their conduct violated the FDUTPA.

187. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles

as safe and reliable, despite their knowledge of the ACU Defect or their failure to reasonably investigate it.

188.     To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

189.     Defendants owed Plaintiffs and the Florida Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them because Defendants:

a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from Plaintiffs and the Florida Consumer Sub-Class; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Florida Consumer Sub-Class that contradicted these representations.

190.     Because Defendants fraudulently concealed the ACU Defect in Class Vehicles and/or the Defective ACUs installed in them, resulting in negative publicity once the ACU Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

191.     Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective ACUs in Class Vehicles were material to Plaintiffs and the Florida Consumer Sub-Class. A vehicle made by a reputable manufacturer

of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

192.    Plaintiffs and the Florida Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the ACU Defect that existed in the Class Vehicles and/or the Defective ACUs installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Florida Consumer Sub-Class either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Florida Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

193.    Plaintiffs and the Florida Consumer Sub-Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, the Florida Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

194.    As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

195.    Plaintiffs and the Florida Consumer Sub-Class are entitled to recover their actual damages under Section 501.211(2), Florida Statutes, and attorneys' fees under Section § 501.2105(1), Florida Statutes.  Plaintiffs and the Florida Consumer Sub-Class also seek an order enjoining

196.    Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**III.    California Statutory Claims**

## COUNT 8

**Violation of Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability**

197.    Plaintiffs bring this claim on behalf of themselves and the members of the Class under the laws of California against the Vehicle Manufacturer Defendants with regard to Class Vehicles that the Vehicle Manufacturer Defendants manufactured or sold.

198.    Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

199.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

200.    The Vehicle Manufacturer Defendants are a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

201.    The Vehicle Manufacturer Defendants impliedly warranted to the Plaintiffs that their Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

202.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

a. Pass without objection in the trade under the contract description.

b. Are fit for the ordinary purposes for which such goods are used.

c. Are adequately contained, packaged, and labeled.

d. Conform to the promises or affirmations of fact made on the container or label.

203.    The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective ACUs, which among

other things, may fail to deploy airbags and seat belt pretensioners in a crash event due to the ASICs being damages by EOS, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, instead of protecting vehicle occupants from bodily injury during accidents.

204.    Because of the ASIC Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

205.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the ASIC Defect. The Vehicle Manufacturer Defendants failed to warn about that dangerous ASIC Defect in the Class Vehicles.

206.    The Vehicle Manufacturer Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective ACUs containing the ASIC Defect which among other things, may fail to deploy airbags and seat belt pretensioners in a crash event due to the ASICs being damages by EOS. The Defective ACUs have deprived the Plaintiffs of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

207.    Notice of breach is not required because Plaintiffs and the Class did not purchase their automobiles directly from the Vehicle Manufacturer Defendants. Furthermore, on information and belief, the Vehicle Manufacturer Defendants had notice of these issues by their knowledge of the issues, through numerous complaints filed against it and/or others, internal investigations, and individual letters and communications sent by consumers before the Vehicle Manufacturer Defendants issued the recalls and after the allegations of the ASIC Defect became public.

208.    As a direct and proximate result of the Vehicle Manufacturer Defendants' breach of their duties under California's Lemon Law, Plaintiffs and the Class received goods whose dangerous condition substantially impairs their value. Plaintiffs and the Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

209.     Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles.

210.     Under Cal. Civ. Code § 1794, Plaintiffs and the Class are entitled to costs and attorneys' fees.

## COUNT 9

### Violation of the California Unfair Competition Law Cal. Bus. & Prof. Code § 17200

211.     Plaintiffs bring this claim on behalf of themselves and the members of the Class against the Vehicle Manufacturer Defendants.

212.     Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ." The Vehicle Manufacturer Defendants engaged in conduct that violated each of this statute's three prongs.

213.     The Vehicle Manufacturer Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act and Cal. Civ. Code § 1750 as set forth below, by the acts and practices set forth in this Complaint.

214.     The Vehicle Manufacturer Defendants also violated the unlawful prong because they have engaged in violations of the TREAD Act, 49 U.S.C. § 30101, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and the NHTSA of the defective Class Vehicles and/or the Defective ACUs installed in them and failing to remedy the ASIC Defect.

215.     Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle

defect within five days of determining that a defect in a vehicle has been determined to be safety-related. See 49 C.F.R. § 573.6.

216. The Vehicle Manufacturer Defendants violated the reporting requirements of FMVSS 573 by failing to report the ASIC Defect or any of the other dangers or risks posed by the Defective ACUs within five days of determining the defect existed, and failing to recall all Class Vehicles.

217. The Vehicle Manufacturer Defendants violated the common-law claim of negligent failure to recall, because the Vehicle Manufacturer Defendants knew or should have known that the Class Vehicles and/or the Defective ACUs installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; the Vehicle Manufacturer Defendants became aware of the attendant risks after they were sold; the Vehicle Manufacturer Defendants continued to gain information further corroborating the ASIC Defect and dangers posed by it; and the Vehicle Manufacturer Defendants failed to adequately recall the defective vehicles in a timely manner, which failure was a substantial factor in causing harm to Plaintiffs and the Class, including diminished value and out-of-pocket costs.

218. The Vehicle Manufacturer Defendants committed unfair business acts and practices in violation of §17200 when they concealed the existence and nature of the ASIC Defect and the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them. The Vehicle Manufacturer Defendants represented that the Class Vehicles and/or the Defective ACUs installed in them were reliable and safe when, in fact, they are not.

219. The Vehicle Manufacturer Defendants also violated the unfairness prong of §17200 by failing to properly administer the numerous recalls of Class Vehicles with the Defective ACUs installed in them.

220. The Vehicle Manufacturer Defendants violated the fraudulent prong

of §17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them as set forth in this Complaint were likely to deceive a reasonable consumer and the information would be material to a reasonable consumer.

221.    The Vehicle Manufacturer Defendants committed fraudulent business acts and practices in violation of §17200 when they concealed the existence and nature of the ASIC Defect and the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective ACUs installed in them were reliable and safe when, in fact, they are not. The Vehicle Manufacturer Defendants' active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them are likely to mislead the public with regard to their true defective nature.

222.    The Vehicle Manufacturer Defendants violated the unfair prong of §17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective ACUs installed in them and the Vehicle Manufacturer Defendants' failure to adequately investigate, disclose, and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. The Vehicle Manufacturer Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented the Plaintiffs and the Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the Defective ACUs installed in them and/or the price to be paid to purchase or lease them.

223.    Plaintiffs and the Class have suffered injuries in fact, including the loss of money or property, as a result of the Vehicle Manufacturer Defendants' unfair, unlawful, and/or deceptive practices. As set forth above, each member of the

Class, in purchasing or leasing Class Vehicles with the Defective ACUs installed in them, relied on the misrepresentations and/or omissions of the Vehicle Manufacturer Defendants with respect of the safety and reliability of the vehicles. Had Plaintiffs and the Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

224.    All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of the Vehicle Manufacturer Defendants' businesses. The Vehicle Manufacturer Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

225.    As a direct and proximate result of the Vehicle Manufacturer Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

226.    Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin the Vehicle Manufacturer Defendants from continuing its unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code §17203; and for such other relief set forth below.

## **<u>COUNT 10</u>**

### **Violation of the Consumer Legal Remedies Act Cal. Civ. Code §1750**

227.    Plaintiffs bring this claim on behalf of themselves and the members of the Class under the laws of California against the Vehicle Manufacturer Defendants.

228.    The Class Vehicles are "goods" as defined in Cal. Civ. Code §1761(a).

229.    The Vehicle Manufacturer Defendants are "persons" as defined in Cal. Civ. Code §1761(c).

230.    Plaintiffs and Class members are "consumers" as defined in Cal. Civ. Code §1761(d).

231.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ.
Code §1750, prohibits "unfair or deceptive acts or practices undertaken by any
person in a transaction intended to result or which results in the sale or lease of goods
or services to any consumer[.]" Cal. Civ. Code §1770(a).

232.    The Vehicle Manufacturer Defendants have engaged in unfair or
deceptive acts or practices that violated Cal. Civ. Code §1750, as described above
and below, by among other things, representing that the Class Vehicles and/or the
Defective ACUs installed in them have characteristics, uses, benefits, and qualities
which they do not have; representing that they are of a particular standard, quality,
and grade when they are not; advertising them with the intent not to sell or lease
them as advertised; and representing that the subject of a transaction involving them
has been supplied in accordance with a previous representation when it has not.

233.    In the course of its business, the Vehicle Manufacturer Defendants
failed to disclose and actively concealed the dangers and risks posed by the Class
Vehicles and/or the Defective ACUs installed in them as described herein and
otherwise engaged in activities with a tendency or capacity to deceive.

234.    The Vehicle Manufacturer Defendants also engaged in unlawful
trade practices by representing that the Class Vehicles and/or the Defective ACUs
installed in them have characteristics, uses, benefits, and qualities which they do not
have; representing that they are of a particular standard and quality when they are
not; advertising them with the intent not to sell or lease them as advertised; and
omitting material facts in describing them. The Vehicle Manufacturer Defendants
are directly liable for engaging in unfair and deceptive acts or practices in the
conduct of trade or commerce in violation of the CLRA. Defendant parent
companies are also liable for their subsidiaries' violation of the CLRA, because the
subsidiaries act and acted as the parent companies' general agents in the United
States for purposes of sales and marketing.

235.    The Vehicle Manufacturer Defendants have known of the ASIC Defect in the Defective ACUs since at least August 2011, when the airbag non-deployment crashes were first attributed to damage of the ASIC by EOS. The Vehicle Manufacturer Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them.

236.    By failing to disclose and by actively concealing the ASIC Defect in the Class Vehicles and/or the Defective ACUs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Vehicle Manufacturer Defendants engaged in unfair or deceptive business practices in violation of the CLRA. In order to ensure that consumers would purchase the Class Vehicles, the Vehicle Manufacturer Defendants deliberately withheld the information about the propensity of the Defective ACUs to fail to deploy airbags and seat belt pretensioners in a crash event due to the ASICs being damages by EOS instead of protecting vehicle occupants from bodily injury during accidents.

237.    The Vehicle Manufacturer Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead the California Consumer Plaintiffs and the California Consumer Class.

238.    The Vehicle Manufacturer Defendants knew or should have known that their conduct violated the CLRA.

239.    As alleged above, the Vehicle Manufacturer Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them that were either false or misleading. The Vehicle Manufacturer Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable,"

despite its knowledge of the ASIC Defect or its failure to reasonably investigate it.

240. To protect their profits and to avoid remediation costs and a public relations nightmare, the Vehicle Manufacturer Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective ACUs installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and to continue driving highly dangerous vehicles.

241. The Vehicle Manufacturer Defendants owed the Plaintiffs and the Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them because they:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs and the Class that contradicted these representations.

242. The Class Vehicles and/or the Defective ACUs installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to the Class, passengers, other motorists, pedestrians, and the public at large, because the Defective ACUs are inherently defective and dangerous in that the Defective ACUs will not deploy lifesaving safety measures of airbags and seatbelt pretensioners, which increases the risk of bodily injury during accidents to drivers and passengers.

243. The Vehicle Manufacturer Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Class, about the true safety and reliability of the Class Vehicles and/or the Defective ACUs

installed in them. The Vehicle Manufacturer Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective ACUs installed in them with an intent to mislead the Class.

244.   The Vehicle Manufacturer Defendants has also violated the CLRA by violating the TREAD Act, 49 U.S.C. §30101, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and the NHTSA of the defective Class Vehicles and/or the Defective ACUs installed in them and failing to remedy the ASIC Defect.

245.   Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect. 49 U.S.C. §30118(c)(1) & (2).

246.   Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers, and dealers of the defect and remedy the defect. 49 U.S.C. §30118(b)(2)(A) & (B).

247.   Under the TREAD Act, manufacturers must also file a report with the NHTSA *within five working days* of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to the NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year, and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. §276.6(b), (c)(1), (c)(2), & (c)(5).

248.   The manufacturer must also promptly inform the NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal

events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. §276.6(b) & (c).

249. The TREAD Act provides that any manufacturer who violates 49 U.S.C. §30166 must pay a civil penalty to the U.S. Government. The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000." 49 C.F.R. §578.6(c).

250. The Vehicle Manufacturer Defendants engaged in deceptive business practices prohibited by the CLRA and Cal. Civ. Code §1750, by failing to disclose and by actively concealing dangers and risks posed by the Defective ACUs, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

251. The Vehicle Manufacturer Defendants knew that the Class Vehicles and/or the Defective ACUs installed in them contained the ACU Defect, causing non-deployment of airbags and seat belt pretensioners, but the Vehicle Manufacturer Defendants failed for many years to inform the NHTSA of this defect. Consequently, the public, including the Class, received no notice of the ACU Defect, despite the Vehicle Manufacturer Defendants' duty to do so.

252. The Vehicle Manufacturer Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including the Class members, about the true safety and reliability of the Class Vehicles and/or the Defective ACUs installed in them.

253. Because the Vehicle Manufacturer Defendants fraudulently concealed the ACU Defect in Class Vehicles and/or the Defective ACUs installed in them, resulting in negative publicity once the ACU Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the

stigma attached to Class Vehicles by the Vehicle Manufacturer Defendants' conduct, they are now worth significantly less than they otherwise would be.

254.     The Vehicle Manufacturer Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective ACUs in Class Vehicles were material to the Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

255.     The Class suffered ascertainable loss caused by the Vehicle Manufacturer Defendants' misrepresentations and its failure to disclose material information. Had they been aware of the ACU Defect that existed in the Class Vehicles and/or the Defective ACUs installed in them and the Vehicle Manufacturer Defendants' complete disregard for safety, the Class members either would not have paid as much for their vehicles as they did or would not have purchased or leased them at all. Class members did not receive the benefit of their bargain as a result of the Vehicle Manufacturer Defendants' misconduct.

256.     The Class risk irreparable injury as a result of the Vehicle Manufacturer Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to the Class, as well as to the general public. The Vehicle Manufacturer Defendants' unlawful acts and practices complained of herein affect the public interest.

257.     Moreover, the Vehicle Manufacturer Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to the Class.

258.     As a direct and proximate result of the Vehicle Manufacturer Defendants' violations of the CLRA, the Class members have suffered injury-in-fact and/or actual damage. The Class currently owns or leases or within the class period have owned or leased Class Vehicles with Defective ACUs installed in them that are

defective and inherently unsafe. The Class risk irreparable injury as a result of the Vehicle Manufacturer Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to the Class, as well as to the general public.

259.    Plaintiffs have provided the Vehicle Manufacturer Defendants with notice of their violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).  The notice was transmitted on May 16, 2019.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

**A.**    An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

**B.**    A declaration that the ACUs in Class Vehicles are defective;

**C.**    An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

**D.**    An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

**E.**    An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.   A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective ACUs in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the forthcoming recall of the vehicles and correction of the Defective ACUs;

G.   A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.   An award of attorneys' fees and costs, as allowed by law;

I.   An award of prejudgment and post-judgment interest, as provided by law;

J.   Leave to amend this Complaint to conform to the evidence produced at trial; and

K.   Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED:  May 16, 2019                    Respectfully submitted,

**PRITZKER LEVINE LLP**

By: _/s/ *Elizabeth C. Pritzker*
Elizabeth C. Pritzker (SBN: 146267)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan K. Levine (SBN: 220289)
Bethany Caracuzzo (SBN: 190687)
Heather P. Haggarty (SBN: 244186)
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone:  (415) 692-0772
Facsimile:   (415) 366-6110
Email:  jkl@pritzkerlevine.com
              ecp@pritzkerlevine.com
              bc@pritzkerlevine.com
              hph@pritzkerlevine.com


*Attorneys for Plaintiffs Steve Croft and Judith Servis*